UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:14-cv-00319-RBJ

KNAPP LOGISTICS AUTOMATION, INC.,

      Plaintiff,

v.

R/X AUTOMATION SOLUTIONS, INC.

      Defendant.

_____

**KNAPP LOGISTICS AUTOMATION, INC.'S
OPENING BRIEF ON CLAIM CONSTRUCTION**

_____

Pursuant to the Modified Scheduling Order [Dkt. #42], Plaintiff Knapp Logistics

Automation, Inc. ("Knapp") hereby respectfully submits its opening brief addressing the proper

construction of the patent claim terms identified in the Joint Claim Construction and Pre-Hearing

Statement [Dkt. #53].

# TABLE OF CONTENTS

I.       PRELIMINARY STATEMENT ...................................................................1

II.      THE PATENT-IN-SUIT: U.S. PATENT NO. 8,601,776 ...........................1

   A.   The '776 Patent Is Directed to a System
        for Automated Counting and Dispensing of Tablets ...................................2

   B.   The '776 Patent Prosecution History Emphasizes
        Novel Features  of the Invention Over the Prior Art ...................................5

III.     LEGAL STANDARD.................................................................................7

IV.      ARGUMENT ............................................................................................8

   A.   Claim 1[a]: "a secure door" .......................................................................9

   B.   Claim 1[b]: "a hopper assembly"................................................................10

   C.   Claim 1[c]: "a closed canister removably engaged
        with the secure door of the counter"..........................................................12

   D.   Claim 1[d]: "the counter is configured to count the
        tablets  when the secure door of the counter is open and closed"..............13

   E.   Claim 2: "the secure door of the counter is configured
        to be open when the canister is engaged with the counter" ......................15

   F.   Claim 3: "the secure door of the counter is configured
        to be closed when the canister is removed from the counter" ...................16

   G.   Claim 4: "the canister comprises a secure door
        that is  removably engaged with the secure door of the counter".............17

   H.   Claim 5[a]: "wherein the secure doors of the counter
        and the canister are configured to be closed when the
        canister is removed from the counter".......................................................19

   I.   Claim 5[b]: "wherein the secure doors of the counter
         and the canister are configured to be open when the
        canister is engaged with the counter" .......................................................20

V.       CONCLUSION..........................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*DSW, Inc. v. Shoe Pavilion, Inc., 537 F.3d 1342 (Fed. Cir. 2008)* ......................................... 10-11

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ......................................................7

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ..........................................7

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................................7, 8, 9

*Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123 (Fed. Cir. 2006) ...............................7

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576(Fed. Cir. 1996) ............................................7

**Other References**

www.uspto.gov/patents/resources/types/provapp.jsp ......................................................................1

www.uspto.gov/patents/resources/types/utility.jsp.........................................................................7

## I.     PRELIMINARY STATEMENT

On December 10, 2013, Knapp filed a complaint against R/X Automation Solutions, Inc. ("RXAS") in the Western District of Texas for infringement of U.S. Patent No. 8,601,776 (Ex. A[1], the " '776 patent"), civil action no. 13-1112.  That case was transferred to this District on February 4, 2014 [Dkt. #1].  RXAS, *inter alia*, denied infringement [Dkt. #12].  Pursuant to the Modified Scheduling Order, the parties exchanged their preliminary proposed claim constructions and submitted the Joint Claim Construction and Pre-hearing Statement to the Court [Dkt. #53].  Knapp now submits this Opening Brief and the Declaration of Knapp's expert, Dr. Stephen Derby, in support of Knapp's proposed claim constructions.  The issue before the Court is the proper construction of the disputed terms of the asserted claims in the '776 patent.

## II.     THE PATENT-IN-SUIT: U.S. PATENT NO. 8,601,776

Although the application leading to the '776 patent was filed with the U.S. Patent & Trademark Office ("USPTO") on February 17, 2012, the '776 patent actually claims priority to two earlier patent applications.  The first is provisional patent application[2] no. 60/572,955 (the " '955 provisional application") filed on May 20, 2004, by inventor Claus Henkel.  The second is nonprovisional utility patent application no. 11/134,113 (the " '113 application") filed on May 20, 2005.  Mr. Henkel assigned his rights in the '113 application to Knapp Logistics & Automation, Inc., which changed its name to Knapp Logistics Automation, Inc. before the '776

---

[1] A copy of cited exhibits A through F are included in the attached appendix and are supported by the Declaration of Ann G. Fort, sworn to on November 24, 2014 and submitted herewith.  The references to "Ex." herein refer to the exhibits attached to the appendix.

[2] A provisional patent application is a placeholder application filed with the USPTO that does not require all of the elements, such as claims or an inventor oath, required by a nonprovisional patent application.  "A provisional patent application provides the means to establish an early effective filing date in a later filed nonprovisional patent application."  *See* www.uspto.gov/patents/resources/types/provapp.jsp

patent issued.  The '113 application issued as U.S. Patent No. 8,141,330 (the " '330 patent") on

March 27, 2012.  Prior to issuance of the '330 patent, Knapp filed continuation patent

application[3] no. 13/398,979 (Ex. B, the " '979 application") on February 17, 2012, which also

claimed benefit of the same '955 provisional application filing date.  On December 10, 2013, the

'979 application issued as the '776 patent-in-suit.

### A.   The '776 Patent Is Directed to a System for Automated Counting and Dispensing of Tablets

In general, the '776 patent is directed to an automated tablet dispensing system for

dispensing bulk drug products, such as pills or tablets, into bottles, containers, or vials.  ('776,

1:22-25).  The automated system described in the '776 patent specification utilizes a combination

of <u>software</u> and <u>hardware</u> to automate dispensing of bulk drug products, a process that is

otherwise labor intensive, time consuming, and expensive.  As explained below and in the

accompanying declaration of Stephen J. Derby (hereinafter "Derby Decl."), Knapp's technical

witness, the system software controls the operation of hardware components to efficiently

dispense tablets for sale or shipment.  (Derby Decl. ¶¶38-42).

In the "Background of the Invention" section, the '776 patent identifies common

problems found in prior art systems.  ('776, 1:20-47).  One such problem is serial processing,

whereby tablets are emptied into a counter that dispenses directly into empty bottles, limiting

throughput; only after the entire stock is dispensed can the operator begin the counting process

anew.  ('776, 1:22-47).  Other prior art systems suffer from design flaws that result in spillage

when the bulk product is emptied into the counter.  ('776, 1:22-47).  The '776 patent solves those

---

[3] "A continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented."  MANUAL OF PATENT EXAMINATION PROCEDURE § 201.07 9th Ed. March 2014.

problems and others by proposing a novel secure, controlled, and efficient automated tablet

dispensing system.  ('776, 2:50-52).  Figure 2 shows an embodiment of one such system

described in the specification:



Figure 2

('776, figure 2) (modified to correctly identify element 102).  As shown above, an embodiment

of tablet dispensing system 100 includes canister 102 and counter 109.  Counter 109 also

includes a counter door (not shown).  ('776, 4:50-51; 5:9-18).  In that embodiment, counter 109

includes hopper assembly 114 with dispenser reserve 116, vibrating feeder 124, and singulation

channel 122; sensor 126; buffer assembly 128; control board 132; and nozzle assembly 134

extending from counter 109.  Vials, bottles, or similar containers (not shown) positioned below

nozzle assembly 134 receive the dispensed product.  ('776, 3:45-51; 6:23-27).  Typically, such

vials, bottles, or similar containers are delivered to the counter using conveyors that are part of

an automated system.  ('776, 9:13-45; figures 22, 23A-F, 26, and 27A-F).

When separated from the counter 109, the canister 102 alone is shown in figure 3:



Figure 3

The underside of canister 102 can include a bottom plate 104 and a door 106, shown in figures 4 and 5, respectively:



Figure 4          Figure 5

The <u>counter</u> enclosure 110 alone is shown below in figure 7, which, in this embodiment can include a top docking plate 112, shown in figure 8:



Figure 7          Figure 8

To use the embodiment shown in figure 2, an operator (such as a person or robot)

4

removes canister 102 from counter 109 by sliding the bottom plate 104 of canister 102 off of the top docking plate 112 of counter 109.  ('776, 2:61-3:10; 4:50-51).  Canister 102 is taken away and filled with bulk drug product, which may be at a location with restricted access to prevent theft.  Once canister 102 is filled, it is returned to the room where its matching counter is located. The operator then engages canister 102 with counter 109 by sliding the canister bottom plate 104 into alignment with top docking plate 112 on counter 109.  Thereafter, the doors of both canister and counter are opened, either manually or automatically, and the drug product empties completely from canister 102 into counter 109.  Once the drug product is emptied from the canister 102, the doors on both canister 102 and counter 109 can be closed.  The operator can then remove canister 102 to be refilled again while counter 109 performs the operations of counting the drug product and emptying the product into vials, bottles, or similar containers.  In this way, the embodiment depicted can continue to count and dispense drug product while the canister is refilled at another location.  ('776, 2:61-3:10).  The '776 patent specification explains the importance of counter 109 being a closed unit: "the risk of cross contamination and unauthorized personnel from accessing the [drug] product is prevented."  ('776, 5:35-38).

> **B.      The '776 Patent Prosecution History Emphasizes Novel Features
> of the Invention Over the Prior Art**

To obtain allowance of the application that ultimately issued as the '776 patent, during prosecution the patent applicant emphasized the novel features of the claimed invention to the USPTO.  In an office action dated July 3, 2013, the USPTO Examiner rejected the pending claims based on U.S. Patent No. 5,838,575 to Lion ("*Lion*"), asserting that "Lion discloses a counter, a sensor, secure door, hopper, and a close [*sic*] canister, see for example (Figs. 1, 3B, and 11; via a tamper proof canister with removable secure door 46 and/or 80; column 1, lines 57-

63)." (Ex. C at K0114752).

In response, applicant argued that the invention was patentably distinct on multiple

grounds, including nearly <u>all</u> of the features recited in the then-pending independent claim:

> Lion does not include a counter including a <u>secure door</u>, a sensor
> configured to count the tablets, and <u>a hopper assembly</u> configured
> to receive the tablets through the secure door and transfer the
> tablets to the sensor, wherein <u>the counter is configured to count the
> tablets when the secure door of the counter is open and closed</u>, as
> recited in claim 25.

(Ex. D at K0114761)(emphasis in original).[4]  Applicant also explained to the Examiner that the

claims encompass the use of both software and hardware:

> The counter [of the '776 patent application] is specifically
> configured to count the tablets when the secure door of the counter
> is open and closed, although <u>it is understood that counting may be
> selectively discontinued at any time by the operator or
> programmed to temporarily pause during disengagement or
> engagement</u>. In this manner, once the tablets are delivered from the
> canister and into the hopper assembly, the canister may be
> removed and refilled in a secure room while the counter continues
> to perform the operation of counting those tablets and emptying the
> product into vials, bottles, or similar containers.

(Ex. D at K0114761-2) (emphasis added).  Thereafter, the Examiner allowed the application to

issue as the '776 patent.  (Ex. E).

Knapp's proposed constructions of the disputed terms in the '776 patent claims embrace

the full scope of the embodiments described in the specification and emphasized during

prosecution before the USPTO, as explained herein.

---

[4] The pending independent claim recited, *inter alia*, ". . . a secure door; a sensor configured to
count the tablets; and a hopper assembly configured to receive the tablets through the secure
door and transfer the tablets to the sensor. . . wherein the counter is configured to count the
tablets when the secure door of the counter is open and closed."  (Ex. D, *comparing* then-
pending claim 25 at K0114764 *with* argument reciting that same claim language at K0114761).

## III.   LEGAL STANDARD

The meaning of a patent and the terms of art within its claims are questions of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  The words of a claim "are generally given their ordinary and customary meaning" by construing them through the eyes of "one of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  The claim language, however, does not stand alone.

The Court also should consider intrinsic evidence, *i.e.*, the patent specification[5] and prosecution history,[6] when construing claim terms.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("Claims must be read in view of the specification, of which they are a part"), *aff'd* 517 U.S. 370.  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The prosecution history is also relevant to the claim construction process because it demonstrates how the applicant and the patent office understood the invention, and may contain representations made by the applicant regarding the scope of the invention.  *Id*. at 1582-83.  The doctrine of prosecution disclaimer will limit a claim term based on the prosecution history only if the patentee makes "a clear and unmistakable disavowal of scope during prosecution."  *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

---

[5] The patent specification "is a written description of the invention and of the manner and process of making and using the invention that concludes with the claims to the invention."  *See* www.uspto.gov/patents/resources/types/utility.jsp#heading-9
[6] The prosecution history "contains the complete record of all the proceedings before the [USPTO], including any express representations made by the applicant regarding the scope of the claims."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Beyond the intrinsic evidence, extrinsic evidence such as dictionaries (including technical dictionaries) and expert testimony may be used "as long as those [extrinsic] sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324. "[E]xpert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue . . . or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318.

## IV.   ARGUMENT

The parties dispute the proper construction of nine claim terms. Those disputed terms appear in claims 1-5, which are reproduced below with the disputed terms underlined:

> 1. A system for automated tablet dispensing comprising:
>     a counter configured to count tablets, the counter comprising:
>         <u>a secure door</u>;
>         a sensor configured to count the tablets; and
>         <u>a hopper assembly</u> configured to receive the tablets through the
>             secure door and transfer the tablets to the sensor; and
>     <u>a closed canister removably engaged with the secure door of the
>         counter</u> and configured to hold the tablets for delivery through the
>         secure door of the counter and into the hopper assembly;
>     wherein <u>the counter is configured to count the tablets when the secure
>         door of the counter is open and closed</u>.
>
> 2. The system of claim 1, wherein <u>the secure door of the counter is
>     configured to be open when the canister is engaged with the counter</u>.
>
> 3. The system of claim 1, wherein <u>the secure door of the counter is
>     configured to be closed when the canister is removed from the counter</u>.
>
> 4. The system of claim 1, wherein <u>the canister comprises a secure door
>     that is removably engaged with the secure door of the counter</u>.
>
> 5. The system of claim 4, <u>wherein the secure doors of the counter and the
>     canister are configured to be closed when the canister is removed from
>     the counter</u>; and
>     <u>wherein the secure doors of the counter and the canister are configured
>         to be open when the canister is engaged with the counter</u>.

A.   <u>Claim 1[a]</u>: "a secure door"

| Knapp's Proposed Construction | RXAS's Proposed Construction |
|---|---|
| a door that opens and closes, either manually or automatically | a component of the counter that is openable and closeable to allow or obstruct, respectively, tablet access to the counter, where such component is lockable in a position by a locking mechanism that, by itself, is operable to lock such component and physically prevent it from being moved to a different position by unauthorized personnel |

The intrinsic evidence supports Knapp's construction that the term means a door that

opens and closes, either manually or automatically.  To replenish the counter, the '776 patent

explains that, after docking the canister with the counter, the secure door of the counter is

"manually or alternatively, automatically opened, allowing transfer of drug product," which

discloses that process in further detail:

> An exemplary embodiment of a process for placing a filled canister onto the appropriate counter is described as follows. . . . The canister is brought to and docked with the appropriate counter. The canister, counter, and docking station barcodes are verified by scanning and validated via the embedded ID chips. . . .The system automatically opens the security locking mechanism of the counter door.  <u>The doors of the counter</u> and the canister <u>are then manually or alternatively, automatically opened, allowing transfer of drug product into the counter</u>.

('776, 8:48-65) (emphasis added).  As stated in the '776 patent, the counter doors open manually,

or alternatively, automatically, to allow for transfer of the drug product into the counter from the

canister.  True, the intrinsic evidence cited above indicates that in the "exemplary embodiment"

the counter door includes a locking mechanism; however, that is but one embodiment, and not a

requirement of the claimed invention.  (Derby Decl. ¶50); *Phillips*, 415 F.3d at 1323 (courts

should "avoid the danger of reading limitations from the specification into the claims."); *DSW,

Inc. v. Shoe Pavilion, Inc*., 537 F.3d 1342, 1348 (Fed. Cir. 2008) ("when claim language is

broader than the preferred embodiment, it is well-settled that claims are not to be confined to that embodiment").  One of ordinary skill in the art recognizes that a "secure door" does not require a lock, especially when considering the different applications for which the claimed invention might be used, which are considered in the '776 patent specification.  (Derby Decl. ¶51).

The '776 patent explains that the invention distinguishes over the prior art because, *inter alia*, prior art systems "fail to provide the level of security that is as high as desired by most in the industry given the sensitive nature of pharmaceuticals and the possibility of tampering with tablets or capsules."  ('776, 1:39-44).  That statement indicates that most, but not all, in the industry require heightened standards of security when dispensing tablets.  For example, dispensing highly-controlled substances such as painkillers or other narcotics might require that the tablets be under constant lock and key to avoid theft, but, by contrast, dispensing multivitamins might only necessitate rudimentary features to protect against, *e.g.*, accidental spillage and contamination from unwanted pests or foreign objects.  (Derby Decl. ¶¶47-49).  Consideration of those factors, highlighted in the '776 patent, as well as the above-cited intrinsic evidence, supports Knapp's proposed construction: "a door that opens and closes, either manually or automatically."  (Derby Decl. ¶53).

**B.    Claim 1[b]: "a hopper assembly"**

| Knapp's Proposed Construction | RXAS's Proposed Construction |
| --- | --- |
| an assembly that temporarily reserves the tablets | an assembly that includes dispenser reserve, vibrating feeder, and singulation channels |

The embodiment in figure 2 shows an exemplary hopper assembly 114, which is also shown alone in figure 9:



Figure 2

Figure 9

('776, figure 2 (modified to identify canister 102); figure 9; 3:45-51).  As shown in figure 2, canister 102 docked atop counter 109 releases tablets into hopper assembly 114 which temporarily stores tablets before transfer to sensor 126.  ('776, 2:61-3:4).

The '776 patent discloses that hopper assembly 114 temporarily reserves the tablets: "[h]opper assembly 114, shown in FIG. 9, is included in counter 109 for product storage and feeding of tablets through the scanning system."  ('776, 5:42-44) (emphasis added).  Figure 9 in the '776 patent depicts the embodiment of hopper assembly 114 without the surrounding counter 109 or canister 102 in figure 2.  The '776 specification also discloses that

> In one embodiment, the hopper may contain approximately 2000 cc of product . . . .  A vibratory drive may move the product from the hopper to the sensor while spreading and isolating each tablet as it slides along the singulation channel.

('776, 5:56-65).  To one of ordinary skill in the art, the above disclosure means the claimed "hopper assembly" is an apparatus that temporarily reserves the tablets.  (Derby Decl. ¶¶55-57).

In addition to support found in the '776 specification, during prosecution of the patent application, applicant explained to the USPTO Examiner that the hopper temporarily stores

11

tablets.  To distinguish over a prior art reference, applicant argued that, *inter alia*, "the housing 4 of *Lion* does not include a <u>hopper assembly</u> configured to receive the pills [] through the iris aperture [] and transfer the pills [] to the sensor device or detection system [.]."  (Ex. D at K0114761) (emphasis in original).  That argument, which is also considered part of the intrinsic record, supports Knapp's construction of the claim term: "an assembly that temporarily reserves the tablets."  (Derby Decl. ¶¶58-61)

### C.   Claim 1[c]: "a closed canister removably engaged with the secure door of the counter"

| Knapp's Proposed Construction | RXAS's Proposed Construction |
|---|---|
| a closed canister able to be docked with the counter in alignment with the secure door of the counter | a pill container that has removable, restrictive, direct physical contact with the secure door of the counter |

In figure 2, canister 102 can be docked with or removed from counter 109.  One of ordinary skill in the art understands from reading the '776 patent that docking the canister with the dispenser aligns the canister door with the secure door of the counter, to facilitate transfer of tablets.  (Derby Decl. ¶¶62-63) ("secure door" in this claim term would have the same construction as in claim 1[a], above).  The '776 patent describes that very notion:

> That canister is brought to and **docked** <u>with the appropriate counter</u>. . . . The doors of the counter and the canister are then manually or alternatively, automatically opened, <u>allowing transfer of drug product to the counter.  After completion of transfer of the product into the counter,</u> a message is generated instructing closure of the counter door. . . .  The canister door is then closed, and <u>the canister may be removed from the counter and taken to the refill station once again.</u>

('776, 8:54-9:4).  Alignment of the canister and counter is facilitated by, *e.g.*, bottom plate 104 of canister 102 sliding along the rails of top docking plate 112 of counter 109.  (Derby Decl. ¶66).  Again, the '776 patent describes an embodiment in which the top docking plate aligns the canister with counter:

Top docking plate 112 of counter 109 receives the corresponding canister. The counter top door (not shown) remains closed and locked until a proper canister is attached to top docking plate 112 of counter 109 and verification scanning is successfully completed.

('776, 5:8-11; figures 2, 8); (Derby Decl. ¶¶64-65).

Based on the intrinsic evidence, the proper construction of the claim term is "a closed canister able to be docked with the counter in alignment with the secure door of the counter."

(Derby Decl. ¶67)

**D.    Claim 1[d]: "the counter is configured to count the tablets when the secure door of the counter is open and closed"**

| Knapp's Proposed Construction | RXAS's Proposed Construction |
|---|---|
| the counter counts the tablets when the secure door of the counter is both open and closed unless selectively discontinued by a user or electronic computer program | means a counter that is able to count both when its secure door is open and when its secure door is closed, where 'open' means that secure door position that allows for emptying of tablets from the canister into the counter and where 'closed' means that secure door position which blocks entirely the passage of tablets from the canister to the counter |

To one of ordinary skill in the art, this language informs the reader that the invention includes both software and hardware.  (Derby Decl. ¶68).  The '776 patent explains that software in the counter controls operation of the individual hardware components:

- "After a prescription order is entered into the computer system, the appropriate counter may begin counting product into its buffer. . . . Furthermore, the buffer enables intelligent exception handling." ('776, 7:8-16)

- "As an example of a process for filling a vial . . . . The central computer communicates with the control board of each automated tablet dispensing system such that the automated tablet dispensing system can pre-count tablets for vials . . . ." ('776, 11:65-12:19)

(Derby Decl. ¶69).  The novel structure of the claimed invention allows for the canister to empty product into the counter, and then be removed and refilled while the counter continues counting.

('776, 3:4-7) ("Once the drug product is emptied into counter 109, canister 102 may be removed

and refilled in the secure room while counter 109 performs the operations of counting the drug

product and emptying the product into vials, bottles, or similar containers") (emphasis added).

      Software in the counter instructs the hardware to begin counting when product is

received.  One of ordinary skill understands that the counter can count tablets while the secure

door of the counter is both open (such as when the canister is docked in alignment with the

counter and is in the process of transferring tablets) and closed (such as after the canister has

transferred tablets and has been removed).  (Derby Decl. ¶¶70-71).  Likewise, one of ordinary

skill also understands, based on the specification, that software controls operation of the counter

and can start or stop counting depending on the circumstances, *e.g.*, after a prescription order is

entered, or to start pre-counting or stop pre-counting the tablets.  ('776, 7:8-16, 11:65-12:19)

(Derby Decl. ¶¶72-74).

      The inventor explained that understanding of the patent claim scope to the USPTO

Examiner during prosecution of the '979 application.  In response to the Examiner's rejection,

Applicant explained, *inter alia*, that:

> The counter [of the application] is specifically configured to count the
> tablets when the secure door of the counter is open and closed, although it
> is understood that counting may be selectively discontinued at any time by
> the operator or programmed to temporarily pause during disengagement or
> engagement.  In this manner, once the tablets are delivered from the
> canister and into the hopper assembly, the canister may be removed and
> refilled in a secure room while the counter continues to perform the
> operation of counting those tablets and emptying the product into vials,
> bottles, or similar containers.

(Ex. D at K0114761-2)(emphasis added).  One of ordinary skill in the art understands that

statement to mean the counter counts tablets unless selectively discontinued by the operator or

software.  (Derby Decl. ¶75).  As a result of that and other arguments, the Examiner allowed the claims to issue as the '776 patent.  (Ex. E).

Based on the intrinsic evidence, the proper construction of the claim term is "the counter counts the tablets when the secure door of the counter is both open and closed unless selectively discontinued by a user or electronic computer program."  (Derby Decl. ¶76).

**E.      Claim 2: "the secure door of the counter is configured to be open when the canister is engaged with the counter"**

| Knapp's Proposed Construction | RXAS's Proposed Construction |
| --- | --- |
| the secure door of the counter opens manually, or alternatively, automatically, when the canister is engaged with the counter | whenever the canister is engaged with the secure door of the counter, the counter's secure door must be and can only be open |

The '776 patent discloses that this limitation of dependent claim 2 should be construed to mean "the secure door of the counter opens manually, or alternatively, automatically, when the canister is engaged with the counter."  One objective of the '776 patent is to "increase[] efficiency and reduce[] errors" ('776, 13:33-35).  For example, in an environment dispensing controlled substances, such as painkillers, good design sense dictates the use of locking mechanisms, barcodes, radio frequency, or other verification methods to ensure that the correct canister and counter are docked and to prevent tampering or theft.  (Derby Decl. ¶¶78-82).  The '776 patent confirms that understanding of one of ordinary skill in the art: "The barcode scanning and other security measures described in this paragraph and other paragraphs herein provide a high level of security. . . ." ('776, 7:44-47).  In other operating environments, such as when dispensing multivitamins, perhaps only manual operation of the secure door is necessary when the canister and counter are docked.  (Derby Decl. ¶83).  This claim term covers both scenarios, and potentially others as well.  (Derby Decl. ¶84)

The limitation recited in claim 2 comports with the desired increased efficiency and error reduction provided by the invention.  As shown in figure 2 and the accompanying written description, when engaging canister 102 with counter 109, the software causes the door of the counter to open, either manually or automatically:

> An exemplary embodiment of a process for placing a filled canister onto the appropriate counter is described as follows. . . .  The canister is brought to and docked with the appropriate counter. The canister, counter, and docking station barcodes are verified by scanning and validated via the embedded ID chips. . . .The system automatically opens the security locking mechanism of the counter door.  The doors of the counter and the canister are then manually or alternatively, automatically, opened, allowing transfer of drug product into the counter.

('776, 8:48-65) (emphasis added).  That passage explains that the counter secure door is opened once the canister and counter are engaged, or docked, together.  (Derby Decl. ¶81).  The specification describes an embodiment using embedded ID chips and a locking mechanism, but one of ordinary skill in the art recognizes that those features do not limit the claim.  Thus, allowing for manual or automatic opening of the secure counter doors when engaging the canister and counter serves to increase efficiency and reduce errors.  (Derby Decl. ¶82).

Based on the intrinsic evidence, the proper construction of the claim term is "the secure door of the counter opens manually, or alternatively, automatically, when the canister is engaged with the counter."  (Derby Decl. ¶85).

**F.**   **Claim 3: "the secure door of the counter is configured to be closed when the canister is removed from the counter"**

| Knapp's Proposed Construction | RXAS's Proposed Construction |
|---|---|
| the secure door of the counter closes manually, or alternatively, automatically, when the canister is removed from the counter | whenever the canister is disengaged from (and no longer in direct physical contact with) the secure counter door, the counter's secure door must be and can only be closed |

16

In a mirror image of dependent claim 2, dependent <u>claim 3 provides for</u> manual or automatic <u>closing</u> of <u>the secure door</u> when the canister is removed from the counter. The '776 patent discloses that when removing the canister from the counter, the counter secure door closes:

> An exemplary embodiment of a process for placing a filled canister onto the appropriate counter is described as follows. . . . <u>After completion of transfer of drug product to the counter, a message is generated instructing closure of the counter door. Once the door is closed,</u> the security mechanism automatically locks the door. The canister door is then closed, and <u>the canister may be removed from the counter and taken to the refill station once again.</u>

('776, 8:48-9:4) (emphasis added). One of ordinary skill in the art understands that the secure door can be closed either manually or automatically once "a message is generated instructing closure of the counter door." (Derby Decl. ¶¶89-90). For example, a wireless RF gun (described at 8:27-61), can display a message instructing the user to manually close the secure door. *Id*. In the alternative, the generated message can be sent to the counter software to cause the secure door to close automatically. *Id*.

Based on the intrinsic evidence, the proper construction of the claim term is "the secure door of the counter closes manually, or alternatively, automatically, when the canister is removed from the counter." (Derby Decl. ¶91).

### G.   <u>Claim 4</u>: "the canister comprises a secure door that is removably engaged with the secure door of the counter"

| Knapp's Proposed Construction | RXAS's Proposed Construction |
|---|---|
| the canister having a secure door, the canister able to be docked with the counter in alignment with the secure door of the counter | the secure door of the canister is in removable, direct physical contact with the secure door (as construed above) of the counter |

This term in dependent claim 4 recites the further limitation that the <u>canister</u> (not just the <u>counter</u> of claim 1) includes a secure door, which is removably engaged with the secure door of

17

the counter.  Like the "removably engaged" limitation in claim 1, the canister secure door docks

in alignment with the counter secure door. ('776, 5:8-11, 8:54-9:4) (Derby Decl. ¶93).

The '776 patent discloses that the canister can have a secure door, which may take

different forms depending on the particular real-world application of the system.  (Derby Decl.

¶94).  For example, the patent discloses multiple different embodiments relying on, *inter alia*, a

sliding access door, a tamper proof security tag, a barcode, and/or an RF chip verification

system:

- "In one embodiment . . . <u>a sliding access door</u> may be present at the bottom of the canister. The door can be pulled out to enable access to the canister chamber where the product will be stored." ('776, 3:20-23) (emphasis added)

- "<u>a tamper proof security tag</u> can be placed through openings on either side of the canister." ('776, 3:23-29) (emphasis added)

- "In one embodiment, the canister can be provided with <u>a triangular label with a 2D barcode</u> and a four digit number <u>or alternatively, an RF chip electronic verification system</u>." ('776, 3:29-34) (emphasis added)

The specification also discloses that the secure door of the canister is able to be docked

with the counter in alignment with the secure door of the counter:

> An exemplary embodiment of a process for placing a filled canister onto the appropriate counter is described as follows. . . .  <u>The canister is brought to and **docked** with the appropriate counter</u>. The canister, counter, and docking station barcodes are verified by scanning and validated via the embedded ID chips. . . .The system automatically opens the security locking mechanism of the counter door.  <u>The doors of the counter and the canister are then manually or alternatively, automatically opened, allowing transfer of drug product into the counter</u>. . . . The canister door is then closed, and the canister may be removed from the counter and taken to the refill station once again.

('776, 8:48-9:4) (emphasis added).  That disclosure supports Knapp's proposed construction that

the <u>canister</u> also has a secure door, and the canister is able to be docked with the counter in

alignment with the secure door of the counter.  (Derby Decl. ¶95).

Based on the intrinsic evidence, the proper construction of the claim term is "the canister having a secure door, the canister able to be docked with the counter in alignment with the secure door of the counter."  (Derby Decl. ¶96).

**H.**      **Claim 5[a]: "wherein the secure doors of the counter and the canister are configured to be closed when the canister is removed from the counter"**

| Knapp's Proposed Construction | RXAS's Proposed Construction |
| --- | --- |
| the secure doors of the counter and the canister close manually, or alternatively, automatically, when the canister is removed from the counter | whenever the canister is disengaged from (and no longer in direct physical contact with) the secure door of the counter, the secure doors of the canister and the counter must be and can only be closed |

This claim term is similar to the disputed term in claim 3 ("the secure door of the counter is configured to be closed when the canister is removed from the counter"), *supra* at IV.F.  The difference in this claim term is that it includes the limitation that <u>both</u> the secure door of the counter <u>and</u> the secure door of the canister (as opposed to claim 3, which recites only the secure door of the counter) are configured to be closed when the canister is removed from the counter. For the sake of consistency, Knapp proposes the same construction for this claim term as for claim 3, just in a different part of the claimed system.

As with claim 3, support for Knapp's construction of this claim term that the secure doors of the counter and canister close manually, or automatically, when the canister is removed from the counter is found in the '776 patent specification at 8:48-9:4.  One of ordinary skill in the art understands that the secure door can be closed either manually or automatically once "a message is generated instructing closure of the counter door."  That message can be legible to the operator, or a software instruction not communicated to the operator.  (Derby Decl. ¶¶101-102).

Based on the intrinsic evidence, the proper construction of the claim term is "the secure

doors of the counter and the canister close manually, or alternatively, automatically, when the

canister is removed from the counter."  (Derby Decl. ¶103)

I.    **Claim 5[b]: "wherein the secure doors of the counter and the canister are configured to be open when the canister is engaged with the counter"**

| Knapp's Proposed Construction | RXAS's Proposed Construction |
|---|---|
| the secure doors of the counter and the canister open manually, or alternatively, automatically, when the canister is engaged with the counter | whenever the canister is engaged with the counter door, the secure doors of the canister and the counter must be and can only be open |

This claim term is similar to the disputed term in claim 2 ("the secure door of the counter

is configured to be open when the canister is engaged with the counter"), *supra* at IV.E.  The

difference in this claim term is that it includes the limitation that <u>both</u> the secure door of the

counter <u>and</u> the secure door of the canister are configured to be open when the canister is

engaged with the counter (as opposed to claim 2, which recites only the secure door of the

<u>counter</u>).  As with claim 2, support for Knapp's construction that the secure doors of the counter

and canister open manually, or alternatively, automatically, when the canister is engaged with the

counter, is found in the '776 specification at 8:48-65 ("The doors of the counter and the canister

are then manually or alternatively, automatically opened, allowing transfer of drug product into

the counter").  Based on the intrinsic evidence, the proper construction of the claim term is "the

secure doors of the counter and the canister open manually, or alternatively, automatically, when

the canister is engaged with the counter."  (Derby Decl. ¶¶106-108).

## V.     CONCLUSION

For the reasons set forth above, Knapp respectfully requests that the Court adopt each of

Knapp's proposed claim constructions.

Dated:  November 24, 2014

SUTHERLAND ASBILL & BRENNAN LLP

By:  */s/Ann G. Fort*
Ann G. Fort
Stephanie G. Stella
Robert R.L. Kohse
999 Peachtree Street NE
Suite 2300
Atlanta, GA 30309
Phone: (404) 853-8000
Fax: (404) 853-8806
Email: ann.fort@sutherland.com
        stephanie.stella@sutherland.com
        rob.kohse@sutherland.com

John M. Tanner
FAIRFIELD & WOODS, P.C.
1801 California St., Suite 2600
Denver, CO 80202
Phone: (303) 830-2400
Email: jtanner@fwlaw.com

*ATTORNEYS FOR PLAINTIFF KNAPP
LOGISTICS AUTOMATION, INC.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 24th day of November, 2014, the foregoing document was filed electronically and was served on all counsel who have consented to electronic service.

*/s/ Robert Kohse*
Robert Kohse